1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   REX CHAPPELL,

11                  Plaintiff,              No. 2:09-cv-1465 GEB KJN P

12        vs.

13   T. PEREZ, et al.,                      ORDER AND

14                  Defendants.             FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17             Plaintiff, a state prisoner proceeding without counsel, seeks relief pursuant to

18   42 U.S.C. § 1983.  Plaintiff alleges that defendants' decision to remove him from single cell

19   status violated his constitutional rights.[1]  Pending before the court is defendants' motion for

20   summary judgment.  As explained below, the court recommends that the motion for summary

21   judgment be granted.

22   II.  Plaintiff's Allegations

23             This action is proceeding on the verified amended complaint filed June 23, 2010.

24   Plaintiff alleges that he required single cell status due to a seizure disorder.  In 2009, plaintiff

25   _____

26        [1]  Plaintiff's state law claims were dismissed on July 8, 2011.  (Dkt. No. 47.)

                                            1

alleges that defendants decided to remove him from single cell status.  Specifically, plaintiff raises three constitutional claims:

      1.  Plaintiff alleges that his First Amendment rights were violated by defendant Bishop who allegedly informed his officers to "snatch" plaintiff's administrative appeal concerning the December 2009 rules violation report, preventing plaintiff from exhausting his administrative remedies, and interfering with plaintiff's access to the courts, allegedly in retaliation for plaintiff's litigation;

      2.  Plaintiff alleges that (a) in an April 1, 2009 classification hearing, defendants Perez, Cochrane, and Murray were deliberately indifferent to plaintiff's serious medical needs by intentionally taking plaintiff's medically-prescribed single cell status, not based on medically sound reasons, but because plaintiff filed litigation against Captain M. Wright, and defendants Perez and Cochrane approved plaintiff for double cell housing; (b) defendants Nepomuceno and Medina were deliberately indifferent to plaintiff's serious medical needs by finding that plaintiff did not need a single cell because of his seizure disorder, and defendant Swingle approved their decision by denying plaintiff's grievance; (c) defendants Nepomuceno and Swingle were deliberately indifferent to plaintiff's serious medical needs by ignoring plaintiff's prior single cell status chronos, and removing plaintiff from lower bunk and floor status; and (d) defendants Williams and Glover were deliberately indifferent because they placed plaintiff in a cell with inmate Stevenson; and

      3.  Defendant Bishop violated plaintiff's due process and equal protection rights by finding plaintiff guilty on December 30, 2009, of a disciplinary violation because plaintiff obstructed an officer by refusing a cellmate in November 2009, after medical and mental health staff found plaintiff did not require a single cell.

III.  <u>Motion for Summary Judgment</u>

      Defendants move for summary judgment on the grounds that there are no genuine issues of material facts and they are entitled to judgment as a matter of law.  Plaintiff filed an

1  opposition, and defendants filed a reply.  On July 18, 2012, plaintiff was advised of the

2  requirements for filing an opposition to a motion for summary judgment under Rand v. Rowland,

3  154 F.3d 952, 957 (9th Cir. 1998), and granted an additional twenty-one days in which to file a

4  supplemental opposition.  On August 13, 2012, plaintiff filed a supplemental opposition.

5  Defendants filed a supplemental reply on August 20, 2012.

6                      A.  Legal Standard for Summary Judgment

7             Summary judgment is appropriate when it is demonstrated that the standard set

8  forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if

9  the movant shows that there is no genuine dispute as to any material fact and the movant is

10  entitled to judgment as a matter of law. "  Fed. R. Civ. P. 56(a).[2]

11                      Under summary judgment practice, the moving party always bears
                    the initial responsibility of informing the district court of the basis

12                      for its motion, and identifying those portions of "the pleadings,
                    depositions, answers to interrogatories, and admissions on file,

13                      together with the affidavits, if any," which it believes demonstrate
                    the absence of a genuine issue of material fact.

14

15  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

16  56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

17  only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

18  Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

19  387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory

20  Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial

21  burden of production may rely on a showing that a party who does have the trial burden cannot

22  produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

23  should be entered, after adequate time for discovery and upon motion, against a party who fails to

24

25        [2]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10,
2010.  However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule

26  56, "[t]he standard for granting summary judgment remains unchanged."

1   make a showing sufficient to establish the existence of an element essential to that party's case,
2   and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.
3   "[A] complete failure of proof concerning an essential element of the nonmoving party's case
4   necessarily renders all other facts immaterial."  Id. at 323.

5          Consequently, if the moving party meets its initial responsibility, the burden then
6   shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.
7   See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting
8   to establish the existence of such a factual dispute, the opposing party may not rely upon the
9   allegations or denials of its pleadings, but is required to tender evidence of specific facts in the
10   form of affidavits, and/or admissible discovery material in support of its contention that such a
11   dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party
12   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome
13   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
14   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.
15   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could
16   return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,
17   1436 (9th Cir. 1987).

18          In the endeavor to establish the existence of a factual dispute, the opposing party
19   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the
20   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing
21   versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary
22   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a
23   genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory
24   committee's note on 1963 amendments).

25          In resolving a summary judgment motion, the court examines the pleadings,
26   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

1  any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson,

2  477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the

3  court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587.

4  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

5  produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen

6  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

7  1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

8  show that there is some metaphysical doubt as to the material facts. . . . Where the record taken

9  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

10  'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

11          By orders filed August 13, 2010, and July 18, 2012, the court advised plaintiff of

12  the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil

13  Procedure. See Rand, 154 F.3d at 957.

14          B.  Undisputed Facts

15          For purposes of the instant motion for summary judgment, the court finds the

16  following facts undisputed.

17          1.  Plaintiff Rex Chappell is a California prisoner who was confined at High

18  Desert State Prison (HDSP) at the time of the events alleged in the complaint in this action.

19          2.  Plaintiff is currently confined in the Security Housing Unit ("SHU") at the

20  California Correctional Institution, Facility IVB ("CCI-IVB").

21          3.  Plaintiff has been in custody in various institutions of the California

22  Department of Corrections and Rehabilitation ("CDCR") since October 1981.

23  ////

24  ////

25  ////

26  ////

4.   Plaintiff claims that he fell off a cliff in 1968,[3] when he was a teenager.  (Defs.'
Ex. B, Tate Decl., ¶ 6.)[4]  He has given an inconsistent history of being unconscious for several
minutes, two days, or a week.[5]  (Id.)  There is no documentation in plaintiff's unified health
record from community health care providers to substantiate that history or of medical treatment
before plaintiff's incarceration.  (Id.)  Plaintiff concedes his temper is bad.  (Dkt. No. 61 at 13.)

5.   On February 14, 1995, Dr. Maukonen saw plaintiff for a neurology
consultation for numbness in his lower left leg.[6]  (Defs.' Ex. B, Tate Decl., ¶ 7.)  During that
evaluation, plaintiff reported injuring his lower back when he fell from the cliff and getting

---

[3]  Although defendants claim plaintiff fell off the cliff in 1969, citing a medical record
stating that plaintiff fell "at about the age of 18 or 19," plaintiff states he fell off the cliff in 1968.
(Dkt. No. 61 at 12.)  This is also confirmed by the medical record from an April 23, 1997
evaluation performed at Pelican Bay State Prison.  (Dkt. No. 69 at 18.)  Plaintiff also challenges
the medical records provided by defendants as hearsay; however, medical records are admissible
under the business-records exception to the hearsay rule.  Fed. R. Evid. 803(6).  Moreover, as
noted by defendants, plaintiff also relies on copies of medical and mental health records in
opposing the instant motion.  Thus, plaintiff's hearsay objection is overruled.

[4]  Plaintiff challenges the declaration of Harold F. Tate, M.D., on the grounds that Dr.
Tate was not plaintiff's treating doctor.  However, in Semantilli v. Trinidad Corp., 155 F.3d
1130, 1134 (9th Cir.1998), the Ninth Circuit held that a medical doctor's testimony regarding
whether an employee's physical and mental disabilities contributed to his slip and fall could be
based on the physician's experience and medical records review, and did not require a physical
examination to be admissible.  Thus, plaintiff's objection is overruled.

[5]  Plaintiff declares he "has never said anything other than he was in a coma for seven
days."  (Dkt. No. 61 at 12.)  Plaintiff reported he was in a coma for seven days on December 5,
2008.  (Dkt. No. 69 at 10.)  However, on April 23, 1997, plaintiff reported he was unconscious
for two days (dkt. no. 69 at 18), and on June 24, 1997, Dr. Maukonen recorded that plaintiff "was
apparently knocked out for a few minutes only."  (Dkt. No. 69 at 79.)

[6]  Plaintiff disputes this fact, claiming that he saw Dr. Maukonen "for his seizure disorder
nothing else."  (Dkt. No. 61 at 13.)  However, plaintiff provides no evidence in support of this
claim.  Plaintiff does not provide a copy of a medical record from the February 14, 1995
appointment that confirms he was seen for a seizure disorder.  (Id.)  The medical record from Dr.
Maukonen's consult makes no reference to a seizure disorder, does not indicate that plaintiff
complained of having seizures or symptoms related to seizures, and with the exception of
plaintiff noting a history of intermittent chest pains, high blood pressure, and frequent headaches,
the medical report is focused on plaintiff's left leg.  (Dkt. No. 69 at 16-17.)  Moreover, in Dr.
Maukonen's June 24, 1997 report, Dr. Maukonen recounts previously seeing plaintiff "several
years ago because of leg numbness on the right."  (Dkt. No. 21 at 36.)  Thus, the court finds fact
5 to be undisputed.

frequent headaches in the occipital area of his skull, radiating to the top of his head, which seemed to get better when he took nitroglycerin ("NTG") for chest pain.  (Id.)  A physical examination was normal, and Dr. Maukonen found that plaintiff might have injured a superficial nerve injury that left him with numbness, but that he had no radicular pain.  (Id.)  Dr. Maukonen found that there was no treatment he could offer for the reported numbness in his leg.  (Id.)  Plaintiff did not complain of seizures at that time, and there is nothing in his unified health record to show that he was being treated for a seizure disorder or that he had been approved for a single cell because of attacks on cellmates when he was having a seizure.  (Id.)

6.  In an April 23, 1997, mental status evaluation, a psychiatrist[7] noted that plaintiff was transferred to CCI in July 1996, and was

> described at that point as losing track of what he was saying, having feelings of falling, and becoming disoriented for brief periods of time.  The question of Temporal Lobe Epilepsy was raised[,] and [plaintiff] was referred for EOP level of care at that time.

(Dkt. No. 69 at 19.)  Plaintiff was prescribed valproic acid (Depakote) for seizures, as well as various medications to treat mental illness.  (Defs.' Ex. B, Tate Decl., ¶ 8.)

7.  On April 23, 1997, a psychiatrist at Pelican Bay State Prison diagnosed plaintiff with bipolar disorder II and paranoia, which was particularly severe when he was having a panic attack. (Defs.' Ex. B, Tate Decl., ¶ 9.)  The psychiatrist found that plaintiff had assaulted other people when having a panic attack, and that he also had probable temporal lobe epilepsy, and reported "losing time" for several minutes, going into a rage, with little to no provocation, and being unable to stop beating other inmates.  (Id.)  The psychiatrist noted that plaintiff was prescribed Lithium (Lithobid) for his mental health problems and that a trial of Carbamazepine

////

---

[7]  Plaintiff contends that it was a psychologist, Judy Beisuda, who diagnosed plaintiff and sent him to the EOP at Pelican Bay, citing Exhibit E.  (Dkt. No. 61 at 13.)  However, there is no "Exhibit E" appended to plaintiff's opposition (dkt. no. 61), and the document labeled as Exhibit E to the amended complaint is not a medical record from Ms. Beisuda (dkt. no. 21 at 50-51).

1  (Tegretol) was being considered for the possible seizure disorder.  (Id.)  This is the first

2  documentation in plaintiff's unified health record that he might have temporal lobe epilepsy.

3         8.  On June 24, 1997, Dr. Maukonen evaluated plaintiff for a possible seizure

4  disorder.  (Defs.' Ex. B, Tate Decl., ¶ 10.)  Plaintiff told Dr. Maukonen that, after his fall in

5  1969, he had begun having episodes of "blacking out" in which he became "panicky" if

6  "someone he did not know" came up behind him and touched him.  (Id.)  He said he would then

7  go into a rage and attack the person, but not remember what had happened afterwards.  (Id.)

8  Plaintiff said he had been told that the episodes were a form of panic or anxiety attack.  (Id.)

9  Plaintiff reported taking valproic acid (Depakote), a medication used to treat manic behavior, and

10  Chlorpromazine (Thorazine), a medication used to treat bipolar disorder.  (Id.)  Plaintiff also said

11  he was taking Tegretol, 200 mg. in the morning, and 400 mg. in the evening for seizures.  (Id.)

12  Plaintiff did not report any unusual smells or sensations, called auras, before a seizure.  (Id.)

13  These are common in persons with temporal lobe epilepsy.  Dr. Maukonen noted that plaintiff's

14  reported symptoms were not typical of seizures.  (Id.)  He ordered an electroencephalograph

15  (EEG) to determine whether plaintiff had brain wave activity indicating a seizure disorder.  (Id.)

16         9.  On August 12, 1997, Dr. Maukonen saw plaintiff who reported that his

17  "temper" was better and that he was not getting in fights because he had a "homeboy" as a

18  cellmate.  (Defs.' Ex. B, Tate Decl., ¶ 11.)  Dr. Maukonen was uncertain whether plaintiff was

19  having complex partial seizures and deferred diagnosis pending results of the EEG.  (Id.)

20        10.  On September 30, 1997, plaintiff's EEG was reported to be abnormal, with

21  slowing in the temporal lobes, that was more prominent on the left than the right side, and with a

22  few scattered sharp waves.  (Defs.' Ex. B, Tate Decl., ¶ 12.)

23        11.  On October 2, 1997, Dr. Maukonen concluded that plaintiff had complex

24  partial epilepsy, and that his seizures were probably controlled with Tegretol, 200 mg. in the

25  morning and 400 mg. in the evening, and chlorpromazine (Thorazine), 50 mg. in the evening for

26  his mental health problems.  (Defs.' Ex. B, Tate Decl., ¶ 13.)  Dr. Maukonen noted that plaintiff

1    reported that his "seizures" were better "now that he had a regular cellmate," whom he had

2    known before going to prison, so that he was not afraid of what would happen if he "blanked

3    out" and "wasn't there."  (Id.)  Plaintiff told Dr. Maukonen that he used to "wale" on whoever

4    would be brought in to be his new cellmate because he was afraid of having anybody he did not

5    know in his cell if he had a seizure.  (Id.)  A person with seizures is not aware of what he is doing

6    and would not physically attack or resist only a person he did not know.  Dr. Maukonen ordered

7    that Tegretol be continued and recommended that plaintiff not work at heights or with moving

8    equipment.  (Id.)  Dr. Maukonen did not order a single cell.  (Id.)

9           12.  Epilepsy occurs when permanent changes in brain tissue cause the brain to

10   send out abnormal electrical signals which then cause recurrent, unpredictable changes in

11   attention or behavior (seizures).  (Defs.' Ex. B, Tate Decl., ¶ 14.)[8]  The type of seizure depends

12   on the part of the brain affected and cause of the epilepsy.  (Id.)  A partial focal seizure occurs

13   when this electrical activity remains in a limited area of the brain.  (Id.)  A temporal lobe seizure

14   is a form of partial focal seizure where the abnormal electrical activity originates in the temporal

15   lobes of the brain.  (Id.)  The seizures typically last for 30 seconds to two or three minutes.  (Id.)

16          13.  A temporal lobe seizure can be simple or complex.  A simple seizure does not

17   affect awareness or memory. (Defs.' Ex. B, Tate Decl., ¶ 15.)  A complex seizure affects

18   awareness or memory of events before, during, and immediately after the seizure, and behavior.

19   (Id.)  Patients with partial complex seizures may or may not remember any or all of the

20   symptoms or events leading the seizure.  (Id.)  Characteristic signs and symptoms of a partial

21   complex seizure due to temporal lobe epilepsy include loss of awareness of surroundings, staring,

22

23          [8] Plaintiff objects that Dr. Tate is not a neurologist, and contends that Dr. Tate is "not
     qualified to do anything except read a book about seizures." (Dkt. No. 61 at 15.)  However, Dr.
24   Tate is a licensed physician, specializing in internal medicine, and therefore is permitted to offer
     testimony based on his professional experience and medical records review.  Semantilli, 155 F.3d
25   at 1134.  Moreover, because plaintiff is a layperson, plaintiff cannot personally dispute Dr. Tate's
     medical opinion.  Plaintiff provided no expert medical opinion substantiating his view that only a
26   neurologist, and not a physician, can opine as to seizures or epilepsy.

1  lip smacking, repeated swallowing or chewing, unusual finger movements, such as picking

2  motions.  (Id.)  Patients may also experience simple partial seizures which may include such

3  features as: a mixture of thoughts, emotions, and feelings that are hard to describe; sudden

4  emergence of old memories or feelings of strangeness in familiar surroundings; and

5  hallucinations of voices, music, smells, or tastes, and feelings of unusual fear or joy.  (Id.)

6          14.  A person can have both epileptic and non-epileptic seizures.  An epileptic

7  seizure is physical in nature, while a non-epileptic seizure is psychological.  (Defs.' Ex. B, Tate

8  Decl., ¶ 16.)  The signs and symptoms of both types of seizures resemble each other, but the

9  medications used to treat them are different.  (Id.)  In plaintiff's case, he has been treated with

10  both psychiatric medications for his mental health problems and seizure medications.  (Id.)

11          15.  A person having a seizure is completely without control over his bodily

12  actions.  (Defs.' Ex. B, Tate Decl., ¶ 17.)  This is true in an "absence-type" seizure, and even

13  more so in the "major motor" type seizure.  (Id.)  For that reason, a person having a seizure

14  cannot "focus" in order to target or pick out a particular person for an aggressive physical attack

15  during a seizure.  (Id.)  A person having a seizure may physically flail his arms and legs and resist

16  being restrained during a seizure, but that activity is not aggressive and targeted at a particular

17  person.  (Id.)  The person observing a seizure should simply wait the few minutes it takes a

18  seizure to run its course before offering assistance, and should not attempt to restrain the person

19  during the seizure.  (Id.)  Moreover, seizures are unpredictable and can occur at any time.  (Id.)

20  They would not occur only in a cell and be directed only at a cellmate.  (Id.)  The seizures could

21  occur anytime and in the presence of other inmates and staff.  (Id.)  Isolation of a person with

22  epilepsy from other people is not possible, nor is it medically indicated or recommended.  (Id.)

23  Rather it is preferable that a person with epilepsy not be isolated so that persons observing a

24  seizure can summon medical assistance, if needed.  (Id.)

25  ////

26  ////

1      16. Although plaintiff gave a history of attacking cellmates during seizures, there

2  is nothing in his unified health record to substantiate that this has happened.[9]  (Defs.' Ex. B, Tate

3  Decl., ¶ 18.)  And there is no record that plaintiff has been treated for injuries inflicted on him by

4  a cellmate during a seizure.  (Id.)

5      17. There are no medical chronos in plaintiff's unified health record for a single

6  cell because of a seizure disorder until 2000.  (Defs.' Ex. B, Tate Decl., ¶ 19.)  Plaintiff,

7  however, was given a medical chrono for low bunk/low tier housing because of a seizure

8  disorder on January 21, 2000.  (Id.)

9      18. On April 20, 2000, Dr. Johnson, a physician at the California State Prison-

10  Sacramento (CSP-Sacramento) noted that plaintiff reported a history of seizures and that, when

11  touched during a seizure, he had a "rage reaction" and would attack the person who touched him.

12  (Defs.' Ex. B, Tate Decl., ¶ 20.)  Dr. Johnson ordered Tegretol, 200 mg., every morning, and 400

13  mg., every evening, for seizures and noted that it would be "prudent" to house him in a single

14  cell until his seizures were controlled.  (Id.)  Drs. Johnson and Peterson then gave plaintiff a

15  medical chrono, valid from August 15, 2000, to August 15, 2001, for a single cell because of a

16  seizure disorder until his seizures were controlled over a period of time.  (Id.; Dkt. No. 61 at 38.)

17  When this chrono expired on August 15, 2001, a new one was not written.  (Defs.' Ex. B, Tate

18  Decl., ¶ 20.)  There is nothing in plaintiff's unit health record to show that his seizures were not

19  controlled at the time, or that he had ever attacked a cellmate when touched during a seizure, nor

20  is there any record that medical staff had confirmed with custody staff plaintiff's report that he

21  had attacked cellmates during a seizure.  (Id.)  Plaintiff was not given another medical chrono for

22  a single cell because of a seizure disorder between August 15, 2001, and 2004.  (Id.)

23  ////

24  _____

25      [9]  Plaintiff declares that he "never reported scrape[s] or scuffles in cells because . . . [staff]
   would write CDC-115's and take good time credit from plaintiff and [his] cellmate, and then
26  plaintiff would be categorized as a snitch."  (Dkt. No. 61 at 16.)  Because plaintiff did not report
   such events or seek treatment, the court finds that fact 16 is undisputed.

19.  On January 20, 2004, Dr. Loaiza, a physician at the California State Prison-Corcoran (CSP-Corcoran) gave plaintiff a medical chrono for a single cell for one year because of an unspecified medical condition.  (Defs.' Ex. B, Tate Decl., ¶ 21.)  There is no progress note explaining what that medical condition was or the reason for the single-cell chrono. (Id.)  If it was for a seizure disorder, there was no documentation that plaintiff had attacked a cellmate during a seizure or that medical staff had verified that plaintiff had assaulted cellmates during a seizure since the expiration of his previous single-cell chrono.  (Id.)  This chrono, like the previous one for a single cell, was not renewed when it expired in January 2005.  (Id.)

20.  On November 22, 2004, a correctional counselor asked that plaintiff's need for a single cell be evaluated by medical staff. (Defs.' Ex. B, Tate Decl., ¶ 22.)  A week later, Dr. Dang, a physician at CSP-Corcoran, ordered medical chronos for low bunk/low tier housing and a single cell.  (Id.)  The order expired on November 29, 2005, and was not renewed.  (Id.)

21.  On August 5, 2005, plaintiff had an EEG that was reported to be abnormal because it showed infrequent sharp discharges from the left frontal lobe, rather than from the temporal lobe, as shown on the September 30, 1997 EEG.  (Defs.' Ex. B, Tate Decl., ¶ 23.)

22.  In February 2006, mental health staff found that there was no mental health reason plaintiff could not be celled with another inmate.  (Defs.' Ex. B, Tate Decl., ¶ 24.)

23.  On February 13, 2007, plaintiff was transferred to HDSP.  (Defs.' Ex. B, Tate Decl., ¶ 25.)  Following his arrival, a nurse practitioner renewed orders for Phenytoin (Dilantin), 200 mg., every morning, and 300 mg., every evening, for seizures.  (Id.)

24.  Three days later, on February 16, 2007, a correctional counselor, who was preparing information for a classification committee, asked that medical and mental health staff verify whether plaintiff should be single-celled for medical or mental health reasons because any previous chronos had expired years before.  (Dkt. Nos. 69 at 40-41.)

25.  On February 20, 2007, a classification committee continued plaintiff on single-cell status because of prior expired assignments to a single cell for medical reasons, status

1  pending assessment by medical and mental health staff of whether he had a current need for

2  single-cell housing.  (Defs.' Ex. A, Liles Decl., Attach. 1, CF061-062.)  The committee notes

3  reflect the following:

> [Plaintiff] told [the] committee that he had attacked a cellmate in
> the past following a seizure and due to Temporal Lobe seizures has
> been single celled.  C-file documentation notes a fight on 7/7/98
> and 10/13/93 neither of which was in-cell.  [Plaintiff] stated that
> his other altercations occurred while in the SHU and were never
> documented.

8  (Dkt. No. 57-4 at 65.)

9        26.  On June 1, 2007, Dr. Burt, a psychiatrist, did a mental health evaluation

10  during which plaintiff reported a history of seizures and asked for a single cell, claiming that

11  would be "halfawake" and "go off" if someone touched him during a seizure.  (Defs.' Ex. B, Tate

12  Decl., ¶ 27.)  Dr. Burt found noted that plaintiff's description of his behavior was not a typical

13  seizure presentation, but plaintiff states he was diagnosed with temporal lobe epilepsy in 1997

14  and 2005, and plaintiff has been diagnosed with bipolar disorder II.  (Dkt. No. 69 at 44.)  Dr.

15  Burt suspected that plaintiff's reported symptoms were motivated by a desire for secondary gain,

16  i.e. a single cell.  (Dkt. No. 69 at 45.)  Dr. Burt decreased plaintiff's dose of Thorazine because

17  he claimed it made him tired, but Dr. Burt did not order a single cell for mental health reasons, or

18  because of plaintiff's seizure disorder.  (Id.)

19        27.  On June 8, 2007, plaintiff claimed he had a seizure two days before, so his

20  Dilantin dose was increased to 100 mg., three times a day, and a Dilantin level was ordered to see

21  if he had a therapeutic level in his blood.  (Dkt. No. 69 at 46-47.)  A week later, plaintiff claimed

22  he had three seizures since the previous visit, even though his Dilantin dose had been increased.

23  Defs.' Ex. B, Tate Decl., ¶ 28.)  Two months later, his Thorazine dose was increased to 100 mg.,

24  twice a day.[10]  (Id.)

25  _____

26       [10]  Plaintiff disputes fact 27, stating it "simply didn't happen."  (Dkt. No. 61 at 18.)
    However, plaintiff cites to no evidence in support of his position, and fails to explain these

1   28.  On September 25, 2007, plaintiff reported that his last seizure had been a few

2   days before when he had run out of medication. (Defs.' Ex. B, Tate Decl., ¶ 29.)

3   29.  On December 13, 2007, a psychiatrist discontinued all plaintiff's prior

4   psychiatric medications and instead ordered Thorazine, 100 mg., twice a day, every morning, for

5   bipolar disorder, and Lamotrigine (Lamictal), 100 mg., every morning.  (Defs.' Ex. B, Tate Decl.,

6   ¶ 30.)  Lamictal is a medication used to treat epileptic seizures, as well as bipolar disorder.

7   plaintiff was also continued on Dilantin.  (Id.)

8   30.  On January 9, 2008, plaintiff reported that he had fallen during a seizure a

9   few days before.  (Defs.' Ex. B, Tate Decl., ¶ 31.)  His dose of Lamictal was increased to 100

10  mg., twice a day, and he was continued on Dilantin.  (Id.)

11  31.  Plaintiff had remained on single-cell status because classification committees

12  had not been notified by medical and mental health staff about whether he had a current need for

13  single cell housing.  (Defs.' Ex. A, Liles Decl., Attach. 1, CF063-066.)  On January 31, 2008, an

14  institutional classification committee, whose members included Associate Warden Perez,

15  continued plaintiff on single-cell status and again referred him to medical staff for review of

16  whether he should be single-celled because of a seizure disorder.  (Defs.' Ex. H, Def. Perez's

17  Resp. to Pl.'s First Interrogs., Resp. No. 3, Attach. 1.)

18  32.  On February 29, 2008, plaintiff reported that his seizures were under

19  control.[11]  (Defs.' Ex. B, Tate Decl., ¶ 32.)  His Dilantin and Lamictal orders were renewed.  (Id.

20  UHR 043-044.)

21  33.  On April 11, 2008, plaintiff was given a Comprehensive Accommodation

22  Chrono (CDCR 7410) for low bunk/low tier housing and a cane for a knee problem.  (Defs.' Ex.

23

24  ──────────────
    medical records, bearing his name and inmate identification number, that reflect the information
    contained in fact 27.

25

26  [11]  Plaintiff declares that he "reported nothing like his seizures being controlled, because
    they never are."  (Dkt. No. 64 at 18.)

1    B, Tate Decl., ¶ 33.)  A single cell was not ordered.  (Id.)

2           34.  On April 27, 2008, a brief mental health evaluation noted that plaintiff was on

3    Dilantin and Lamictal for his seizure disorder.  (Defs.' Ex. B, Tate Decl., ¶ 34.)  No single cell

4    was ordered.  (Id.)

5           35.  On June 28, 2008, plaintiff was given a Comprehensive Accommodation

6    Chrono for a cane and knee brace, waist chains, and a mobility vest, but his low tier/low bunk

7    housing was discontinued.  (Defs.' Ex. B, Tate Decl., ¶ 35.)

8           36.  On September 22, 2008, a sergeant told a nurse that he had seen plaintiff, who

9    was listed as mobility-impaired, running around the track on the exercise yard without his cane or

10   mobility vest.[12]  (Defs.' Ex. B, Tate Decl., ¶ 36.)  The nurse went out and confirmed what the

11   sergeant had said.  (Id.)  Plaintiff's orders for a cane and disability vest were discontinued

12   because he no longer needed them.  (Id.)

13          37.  On October 7, 2008,[13] Dr. Nepomuceno, at HDSP, approved a

14   Comprehensive Accommodation Chrono written by Physician Assistant Medina approving a soft

15   knee brace and waist chains for plaintiff, but discontinuing his cane and mobility vest.  (Defs.'

16   Ex. B, Tate Decl., ¶ 37.)  The chrono did not provide for low bunk/low tier housing or a single

17   cell.  (Id.)  Plaintiff had been given medical chronos for ground-floor housing and a lower bunk,

18   a cane, and a mobility impairment vest for a knee problem,[14] but those were discontinued because

19   he was observed running around the track without the cane or vest.  (Defs.' Ex. I, Def.

20

21          [12]  Plaintiff denies he was running around the track.  (Dkt. No. 64 at 18.)

22          [13]  Defendants claim this occurred on October 7, 1998.  However, this appears to be a
     typographical error.  Plaintiff was transferred to HDSP in 2007.  Although the handwritten date
23   written by Dr. Nepomuceno appears to be 10/7/6, defendant Medina signed the form on
     September 25, 2008, so it appears that Dr. Nepomuceno approved the chrono on October 7,
24   2008.  (Dkt. No. 69-1 at 4.)

25          [14]  Plaintiff denies that he was given a bottom floor and lower bunk chrono for a knee
     problem, but claims it was provided for his seizure disorder.  (Dkt. No. 61 at 18.)  However,
26   plaintiff adduces no evidence in support of this claim.

1  Nepomuceno's Resp. to Pl.'s First Interrogs., Resp. No. 2; Defs.' Ex. F, Def. Medina's Resp. to

2  Pl.'s First Interrogs., Resp. 6; Defs.' Ex. J, Def. Swingle's Resp. to Pl.'s First Interrogs., Resp.

3  No. 2.)  Defendants Nepomuceno and Medina found it was not medically necessary to order a

4  medical chrono for a single cell based on plaintiff's seizure disorder because the seizures were

5  controlled on medication.  (Id.)  Dr. Swingle agreed with that decision and denied plaintiff's

6  grievance.  (Defs.' Ex. J, Def. Swingle's Resp. to Pl.'s First Interrogs., Resp. Nos. 7, 13.)

7          38.  On October 9, 2008, Physician Assistant Medina saw plaintiff for an inmate

8  appeal (CDCR 602), complaining that he still needed the cane and mobility vest for his knee

9  problem.  (Defs.' Ex. B, Tate Decl., ¶ 38.)  Plaintiff also complained about his seizure history,

10  and Medina said he would be seen for that complaint on his next chronic care visit.  (Id.)

11          39.  On December 3, 2008, plaintiff temporarily transferred to the California State

12  Prison-Solano (CSP-Solano) where he was confined until December 15, 2008. (Defs.' Ex. B,

13  Tate Decl., ¶ 39.)  While there, plaintiff reported that he had not had a seizure for year.  (Id.)  He

14  was continued on Dilantin and Lamictal, and was given a Comprehensive Accommodation

15  Chrono for low bunk/low tier housing and restricting on working at heights and with moving

16  vehicles, but he was not given a single cell chrono.  (Id.)

17          40.  After returning to HDSP, plaintiff complained on January 22, 2009, that he

18  had not gotten his seizure medications for several days, but that he should not be prescribed

19  Dilantin because he had the hepatitis C virus ("HCV").  (Defs.' Ex. B, Tate Decl., ¶ 40.)  He was

20  seen a few days later and reported a "small seizure," when he did not have his medications, but

21  was doing well.  (Id.)  He was continued on Dilantin.  (Id.)

22          41.  On March 9, 2009, Physician Assistant Medina saw plaintiff who reported

23  concerns about taking aspirin ("ASA") and Dilantin because he had HCV and thought those

24  medications would further damage his liver.  (Defs.' Ex. B, Tate Decl., ¶ 41.)

25          42.  On March 14, 2009, a psychiatrist saw plaintiff, who reported that he was

26  pleased with his trial on Lamictal, that it had "taken the edge of everything," that "he had

16

obtained total control of his temporal seizure disorder," and that he had not had a seizure for a

month, which he said he had not achieved with other anti-seizure medications. (Defs.' Ex. B,

Tate Decl., ¶ 42.)

43.   On April 1, 2009, an institutional classification committee, whose members

included Associate Warden Perez, cleared plaintiff for double celling. (Defs.' Ex. H, Def.

Perez's Resp. to Pl.'s First Interrogs., Attach. 2.)[15]  The committee noted the following:

> On 01/20/2004 a Medical 128 stated that [plaintiff] needed to be
> placed on [single cell] status due to a medical condition, this
> Chrono was good from 01/20/2004 until 01/19/2005, when it
> expired. A 128-B dated 10/05/2005 referred [plaintiff] to ICC for
> placement on [single cell] status. A 128-B dated 2/20/2006 from
> Mental Health stated that there was no mental health issue to place
> [plaintiff] on [single cell status], and that his placement was due to
> a medical condition, seizures.

(Dkt. No. 57-5 at 3.)  An October 7, 2008 medical chrono provided <u>no</u> housing accommodations

for plaintiff, including ground floor, bottom bunk or single cell. (Defs.' Ex. A, Liles Decl.,

Attach. 1, CF 073.)  And, although plaintiff had many disciplinary violations since 2004, none

involved assault, battery, or mutual combat. (<u>Id.</u>)

44.   On April 7, 2009, Physician Assistant Medina saw plaintiff, who again

reported concerns about taking ASA and Dilantin because he had HCV. (Defs.' Ex. B, Tate

Decl., ¶ 43.)  Medina noted that he had addressed those concerns and had discontinued the ASA

at plaintiff's request. (<u>Id.</u>)  Plaintiff asked for Clopidogrel (Plavix) for his hypertension instead,

but Medina spoke with Dr. Nepomuceno, who noted that it was contraindicated in patients on

Dilantin. (<u>Id.</u>)  Plaintiff also asked to be single celled because he was "unpredictable" when he

---

[15]   Defendant Associate Warden Perez claims he never saw a medical chrono that said
plaintiff should be single-celled at HDSP because he had a seizure disorder that caused him to
panic and attack persons who touched him during a seizure. (<u>Id.</u> Resp. No. 7.)  However,
plaintiff declares that he showed defendant Perez every "chrono attached to the amended
complaint (and more) about single cell [status]." (Dkt. No. 61 at 19.)  Plaintiff claims that is why
defendant Perez left plaintiff single-celled after Associate Warden Wong single-celled plaintiff.
(Dkt. No. 61 at 19.)  However, the April 1, 2009 Committee Action Summary reflects that the
committee cleared plaintiff for double cell housing. (Dkt. No. 57-5 at 3.)

had a seizure.  (Id.)  Medina discussed the issue with him and noted Dr. Maukonen's 1997 report and plaintiff's claim that he had "rage blackouts" during a seizure and that he was a danger to himself and others.  (Id.)  Medina did not recommend a single cell for the seizure disorder.  An order for a single cell for the seizure disorder based on Dr. Maukonen's 12-year-old report, which did not order a single cell, would not have been appropriate, particularly because plaintiff's seizures had been controlled on Dilantin and Lamictal, and there was no evidence that he had attacked cellmates during a seizure.

45.  On May 5, 2009, a psychiatrist saw plaintiff, who reported that his problem with cellmates was usually his temporal lobe partial seizures, that the frequency of seizures had dropped from three times a week to once a month, but that he was unhappy with the decision to double-cell him, which he thought had been done in retaliation for his legal and administrative grievance activity.  (Defs.' Ex. B, Tate Decl., ¶ 44.)  The psychiatrist noted that plaintiff had almost completed control of his seizures on medication and discussed continued use of Lamictal as both a psychiatric medication and anticonvulsant.  (Id.)  The psychiatrist continued Lamictal at 200 mg., twice a day.  (Id.)

46.  On May 27, 2009, plaintiff told a clinical psychologist that Lamictal was helpful in moderating his mood and that it helped him greatly, but that he was upset about removal of his single-cell status, which he believed was the result of "collusion" by custody and medical staff.  (Defs.' Ex. B, Tate Decl., ¶ 45.)

47.  On June 1, 2009, plaintiff told a psychiatrist that he was taking both Lamictal and Dilantin, that he was more level-headed and less impulsive, and that he had not had any seizures since just before starting the Lamictal.  (Defs.' Ex. B, Tate Decl., ¶ 46.)  The psychiatrist continued him on Lamicatal and Dilantin.  (Id.)

48.  On September 3, 2009, plaintiff had a sleepless EEG, which was reported to be normal.  (Defs.' Ex. B, Tate Decl., ¶ 47.)

////

1        49. On November 5, 2009, a classification committee whose members included

2  Associate Warden Perez and Dr. Murray, a clinical psychologist, cleared plaintiff for double cell

3  housing. (Defs.' Ex. A, Liles Decl., Attach. 1, CF 076; Dkt. No. 48 at 3.) There was no mental

4  health or medical reason he could not be double-celled. (Defs.' Ex. G, Def. Murray's Resp. to

5  Pl.'s First Interrogs., Resp. No. 6.) The decision that plaintiff did not require a medical chrono

6  for a single cell for a seizure disorder was made by medical staff, not Dr. Murray. (Id., Resp. No.

7  12.)

8        50. On November 17, 2009, plaintiff told Physician Assistant Medina that his last

9  seizure had been four months before. (Defs.' Ex. B, Tate Decl., ¶ 48.) He was continued on

10  Dilantin, 300 mg. a day, along with the Lamictal ordered by psychiatrists.[16] (Id.)

11        51. On November 18, 2009, plaintiff was charged with a disciplinary

12  violation for obstructing an officer by refusing to accept a cellmate.[17] (Dkt. No. 57-6 at 20.)

13  Plaintiff showed Sergeant Williams a medical chrono from the year 2000 for a single cell at

14  another prison that medical staff confirmed was no longer in effect. (Defs.' Ex. K, Def.

15  Williams' Resp. to Pl.'s First Interrogs., Resp. No. 3.)

16  ////

17  ////

18

---

19     [16] Plaintiff claims this fact is a "blatant untruth," but cites to no evidence in support of his position, and fails to explain the medical record bearing his name and inmate identification

20  number. (See Dkt. No. 69-1 at 33.)

21     [17] Plaintiff claims that defendants Williams and Bishop wrote this violation and told Nichols to sign it (dkt. no. 61 at 21), and provides a declaration from an inmate who overheard

22  Nichols tell plaintiff that the violation was written up for Nichols and Nichols was told to sign it. (id. at 57.) Correctional Sergeant Williams claims that he did not order Officer Nichols to sign

23  the disciplinary violation. (Defs.' Ex. K, Def. Williams' Resp. to Pl.'s First Interrogs., Resp. No. 2.) Defendant Bishop provided an explanation as to how the process of writing a rule violation

24  report occurs, but declared that he did not personally draft, or order defendant Nichols to sign, the November 18, 2009 rule violation report. (Dkt. No. 57-6 at 18.

25     In addition, plaintiff claims he did not refuse a cellmate, but asked that the cellmate be provided with medical records regarding plaintiff's seizures to see if that cellmate still agreed to

26  house with plaintiff. (Dkt. No. 61 at 21.)

52.  Correctional Lieutenant Bishop conducted a hearing on the disciplinary charge, and found plaintiff guilty, and assessed a 90-day loss of good-time credits.[18]  (Defs.' Ex. D, Def. Bishop Resp. to Pl.'s First Interrogs., Resp. Nos. 2-3, Attach. 1.)  Lieutenant Bishop rejected plaintiff's claim that he had an August 2000 medical chrono for a single cell because more recent evaluations formed the basis for the classification committee's decision to clear him for double celling, and plaintiff did not have a current medical chrono for a single cell.  (Id. Resp. Nos. 14-15.)

53.  On January 27, 2010, plaintiff was given a permanent medical chrono for low bunk/low tier housing, but a single cell was not ordered.  (Defs.' Ex. B, Tate Decl., ¶ 49.)

54.  On February 17, 2010, a clinical psychologist recorded that plaintiff reported that "Lamictal works with my seizures."[19]  (Defs.' Ex. B, Tate Decl., ¶ 50.)  Plaintiff's prescription to Lamictal was continued.  (Id.)

55.  On May 3, 2010, plaintiff was single-celled in Facility D, Building 6, Cell No. 128 at HDSP.  (Defs.' Ex. E, Def. Glover's Resp. to Pl's First Interrogs., Resp. No. 6.)  That day, Sergeant Williams told Officer Glover that a bus with new inmates would be arriving and to see which inmates in the building who were single-celled were clear to be double-celled in order to make room from the new arrivals.  (Id.)  Officer Glover noted that plaintiff and inmate Stevenson (H-13365) were single-celled, but had been cleared by classification committees for double-celling.  Officer Glover also determined that they could be compatibly celled together.

---

[18]  Defendant Bishop contends the hearing was held on December 30, 2009, and his report was completed on December 31, 2009.  Plaintiff claims that defendant Bishop backdated the report, but that in any event, the hearing was untimely.  (Dkt. No. 61 at 21-22.)  Plaintiff provided the declaration of inmate Tyson who witnessed Bishop's conversation with plaintiff re backdating the hearing report.  (Dkt. No. 61 at 74.)  In addition, plaintiff claims it was error for defendant Bishop to rely on the chrono from CSP-Solano because plaintiff was only there for seven days, and could not place plaintiff on single cell status because they did not have plaintiff's file.  (Dkt. No. 61 at 22.)

[19]  Plaintiff denies that he told the psychologist that Lamictal "worked to control seizures," but claims the psychologist told plaintiff that Lamictal would help.  (Dkt. No. 61 at 24.)

1  (Id.)

2        56.  Officer Glover told plaintiff that he would be double-celled with inmate

3  Stevenson.  (Defs.' Ex. E, Def. Glover's Resp. to Pl's First Interrogs., Resp. No. 6.)  Plaintiff told

4  Officer Glover that he would not refuse a cellmate because he did not want to be charged with a

5  disciplinary violation (CDCR 115).  (Id.)  Plaintiff told Officer Glover that he just had to tell

6  Stevenson that plaintiff had recently been validated as a member of the Black Guerrilla Family

7  (BGF).  (Id.)  Officer Glover then spoke with Stevenson and told him he would be double-celled

8  with plaintiff.  (Id.)  Stevenson also said he would not refuse a cellmate because he did not want

9  to get a CDCR 115.  (Id.)  Officer Glover told Stevenson that plaintiff said he had been validated

10 as BGF.[20]

11       57.  According to inmate Stevenson, he told Officer Glover on May 3, 2010, that

12 plaintiff had seizures and would attack his cellmate.  (Dkt. No. 21 at 71.)

13       58.  On May 6, 2010, Stevenson claims that plaintiff told him he was dizzy.  (Dkt.

14 No. 21 at 71.)  Stevenson asked what plaintiff wanted him to do, but plaintiff did not respond.

15 (Id.)  Instead, plaintiff staggered and fell against the upper bunk locker.  (Id.)  Stevenson then

16 took his arm to ease him to the floor or his bed, but plaintiff began to swing and flail his arms,

17 hitting Stevenson in the head and upper body.  (Id.)

18       59.  Stevenson is describing a common situation where a person having a seizure

19 reacts physically by flailing his arms during the seizure and unconsciously strikes a person who

20 tries to restrain him.  (Defs.' Ex. B, Tate Decl., ¶ 51.)  Stevenson should not have touched or

21 restrained plaintiff, as apparently plaintiff had told him, but should simply have waited for the

22 seizure to end.  (Id.)

23       60.  Stevenson then pushed plaintiff against a wall, held him in a headlock, and

24 took him to the floor until he regained total awareness four or five minutes later.  (Dkt. No. 21 at

25

26      [20]  Defendant Glover and plaintiff describe the events surrounding their exchange
differently.  The facts set forth in fact 56 are the statements that appear to be in agreement.

71.)  Stevenson claims to have gotten a knot on his left eye and split lip.  (Id.)  But he did not notify staff of his injuries or what had happened because of the possibility that staff might accuse him of fighting with plaintiff.  (Id.)

61.  After this event, Stevenson and plaintiff celled together without any problem for a month and half, until June 29, 2010.  (Defs.' Ex. C, Pesci Decl., Attach. 1, p. 5.)

62.  On May 12, 2010, plaintiff submitted a Health Care Services Request (CDCR 7362) claiming that his life and his cellmate's was in danger because he had temporal lobe epilepsy and had black outs when he had a seizure, and would attack someone if he was touched or a shadow went in front of him during a seizure.  (Defs.' Ex. B, Tate Decl., ¶ 52.)  Plaintiff claimed he had been single-celled before and objected to being double celled.  (Id.)  He was referred for evaluation and was seen on May 25, 2010.  (Id.)  The doctor noted that he would have to review previous neurological reports and records regarding the claim that he lost time and acted out during seizures.  (Id.)  A single cell was not ordered at that time.  (Id.)

63.  On September 16, 2010, Dr. Ma saw plaintiff, who reported that Dilantin, 300 mg., twice a day, and Lamictal, 200 mg., twice a day, had not controlled his seizures "adequately" and that he had a seizure two weeks before.  (Defs.' Ex. B, Tate Decl., ¶ 53.)  He reported losing consciousness, but not his balance when he had the seizure.  (Id.)  If plaintiff really lost consciousness during a seizure, he would not know whether he had lost his balance. Dr. Ma continued him on his medications, and ordered a Dilantin level to make sure it was at a therapeutic level, but he did not order a single cell.  (Id.)

64.  Plaintiff was transferred to CCI, Facility IVB SHU on February 16, 2011. (Defs.' Ex. B, Tate Decl., ¶ 54.)

65.  At CCI, plaintiff again claimed he should be single-celled because he would attack cellmates during seizures.  (Defs.' Ex. B, Tate Decl., ¶ 55.)  A correctional counselor spoke with Dr. Tate on May 9, 2011, and Dr. Tate advised the counselor that his medical opinion was that it was not possible for plaintiff to target a particular person, like a cellmate or staff, for

1    an aggressive, violent attack during a seizure.  (Id.)  Dr. Tate told the counselor that if plaintiff

2    said he was doing that, it would be because he was awake and alert and choosing to do so, which

3    cannot occur during a seizure.  (Id.)  A classification committee noted that, and cleared

4    plaintiff for a double cell.  (Id.)

5          66.  On March 23, 2011, plaintiff was provided a chrono for ground floor cell and

6    bottom bunk.  (Dkt. No. 71 at 23.)  But there was no provision for single cell housing.  (Id.)

7    IV.  First Amendment Claim

8          As set forth above, plaintiff alleges that his First Amendment rights were violated

9    by defendant Bishop who allegedly informed his officers to "snatch" plaintiff's administrative

10   appeal concerning the December 2009 rules violation report.  (Dkt. No. 21 at 18, 21.)  Plaintiff

11   contends Bishop's actions prevented plaintiff from exhausting his administrative remedies, and

12   interfered with plaintiff's access to the courts.  (Dkt. No. 21 at 19, 21, 83-88.)

13         Prisoners have a constitutional right of access to the courts.  See Lewis v. Casey,

14   518 U.S. 343, 350 (1996); Bounds v. Smith, 430 U.S. 817, 821 (1977).  However, in order to

15   prevail, the prisoner must demonstrate an actual injury to court access.  Lewis, 518 U.S. at 351-

16   53.  An actual injury to court access consists of some specific "instance in which an inmate was

17   actually denied access to the courts."  Sands v. Lewis, 886 F.2d 1166, 1171 (9th Cir. 1989)[21]

18   (quoting Kershner v. Mazurkiewicz, 670 F.2d 440, 444 (3rd Cir. 1982)).

19         First, as defendants point out, plaintiff's exhibit J-1 reflects that plaintiff's

20   grievance was returned to plaintiff because it was missing necessary reports.  (Dkt. No. 21 at 83-

21   88.)  Plaintiff provides no evidence demonstrating he re-submitted the grievance with the

22   required documents.  Second, plaintiff is pursuing his claim concerning the rules violation report

23   in this action.  Thus, plaintiff did not suffer an actual injury because he was not denied access to

24   the courts.  Therefore, plaintiff's First Amendment claim should be denied.

25   _____

26        [21]  Sands was overruled by Lewis v. Casey to the extent that it did not require actual
     injury when a prisoner alleges inadequate assistance.  Id., 518 U.S. at 351.

1    V.  Eighth Amendment Claim

2           Plaintiff alleges that (a) in an April 1, 2009 classification hearing, defendants

3    Perez, Cochrane, and Murray were deliberately indifferent to plaintiff's serious medical needs by

4    intentionally taking plaintiff's medically-prescribed single cell status, not based on medically

5    sound reasons, but because plaintiff filed litigation against Captain M. Wright, and defendants

6    Perez and Cochrane approved plaintiff for double cell housing; (b) defendants Nepomuceno and

7    Medina were deliberately indifferent to plaintiff's serious medical needs by finding that plaintiff

8    did not need a single cell because of his seizure disorder, and defendant Swingle approved their

9    decision by denying plaintiff's grievance; (c) defendants Nepomuceno and Swingle were

10   deliberately indifferent to plaintiff's serious medical needs by ignoring plaintiff's prior single cell

11   status chronos, and removing plaintiff from lower bunk and floor status; and (d) defendants

12   Williams and Glover were deliberately indifferent because they placed plaintiff in a cell with

13   inmate Stevenson.

14          A.  Eighth Amendment Legal Standard

15          Generally, deliberate indifference to a serious medical need presents a cognizable

16   claim for a violation of the Eighth Amendment's prohibition against cruel and unusual

17   punishment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  According to Farmer v. Brennan, 511

18   U.S. 825, 847 (1994), "deliberate indifference" to a serious medical need exists "if [the prison

19   official] knows that [the] inmate [ ] face[s] a substantial risk of serious harm and disregards that

20   risk by failing to take reasonable measures to abate it."  The deliberate indifference standard "is

21   less stringent in cases involving a prisoner's medical needs than in other cases involving harm to

22   incarcerated individuals because 'the State's responsibility to provide inmates with medical care

23   ordinarily does not conflict with competing administrative concerns.'"  McGuckin v. Smith, 974

24   F.2d 1050, 1060 (9th Cir. 1992) (quoting Hudson v. McMillian, 503 U.S. 1, 6 (1992)), overruled

25   on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997).

26   Specifically, a determination of "deliberate indifference" involves two elements:  (1) the

1    seriousness of the prisoner's medical needs; and (2) the nature of the defendant's responses to

2    those needs.  McGuckin, 974 F.2d at 1059.

3            First, a "serious" medical need exists if the failure to treat a prisoner's condition

4    could result in further significant injury or the "unnecessary and wanton infliction of pain."  Id.

5    (citing Estelle, 429 U.S. at 104).  Examples of instances where a prisoner has a "serious" need for

6    medical attention include the existence of an injury that a reasonable doctor or patient would find

7    important and worthy of comment or treatment; the presence of a medical condition that

8    significantly affects an individual's daily activities; or the existence of chronic and substantial

9    pain.  McGuckin, 974 F.2d at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41

10   (9th Cir. 1990)).

11           Second, the nature of a defendant's responses must be such that the defendant

12   purposefully ignores or fails to respond to a prisoner's pain or possible medical need in order for

13   "deliberate indifference" to be established.  McGuckin, 974 F.2d at 1060.  Deliberate

14   indifference may occur when prison officials deny, delay, or intentionally interfere with medical

15   treatment, or may be shown by the way in which prison physicians provide medical care."

16   Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988).  In order for deliberate

17   indifference to be established, there must first be a purposeful act or failure to act on the part of

18   the defendant and resulting harm.  See McGuckin, 974 F.2d at 1060.  "A defendant must

19   purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for

20   deliberate indifference to be established."  Id.  Second, there must be a resulting harm from the

21   defendant's activities.  Id.  The needless suffering of pain may be sufficient to demonstrate

22   further harm.  Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).

23           Mere differences of opinion concerning the appropriate treatment cannot be the

24   basis of an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996);

25   Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  However, a physician need not fail to

26   treat an inmate altogether in order to violate that inmate's Eighth Amendment rights.  Ortiz v.

25

City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case.  Id.

In order to defeat defendants' motion for summary judgment, plaintiff must "produce at least some significant probative evidence tending to [show]," T.W. Elec. Serv., 809 F.2d at 630, that defendants' actions, or failures to act, were "in conscious disregard of an excessive risk to plaintiff's health," Jackson v. McIntosh, 90 F.3d at 332 (citing Farmer, 511 U.S. at 837).

B. Analysis

It is undisputed that on October 2, 1997, when Dr. Maukonen, a neurologist, diagnosed plaintiff with complex partial epilepsy, plaintiff had a cellmate, and Dr. Maukonen did not find that plaintiff required single cell housing.  (Undisputed Fact "UDF" 11.)  Plaintiff was not provided a medical chrono for single cell housing until April 20, 2000, at which time Dr. Johnson noted that it would be "prudent" to house plaintiff in a single cell until plaintiff's seizures were controlled.  (UDF 18.)  Dr. Johnson's chrono expired on August 15, 2001, and plaintiff was not provided another single cell chrono until January 20, 2004.  (UDF 18-19.)  On January 20, 2004, Dr. Loaiza provided plaintiff with a medical chrono for single cell housing, but failed to explain on what basis the chrono was provided.  (UDF 19.)  The chrono expired in January 2005.  (Id.)

On or about November 29, 2004, Dr. Dang ordered plaintiff a medical chrono for single cell housing, which expired on November 29, 2005.  (UDF 20.)  In February of 2006, mental health staff found that there was no mental health reason plaintiff could not be double celled.  (UDF 22.)

Plaintiff was transferred to HDSP in February of 2007, and on February 20, 2007, a classification committee continued plaintiff on single cell housing pending assessment by medical and mental health staff as to whether plaintiff currently needed single cell housing.

(UDF 25.)  On June 1, 2007, psychiatrist Dr. Burt did not order plaintiff a single cell chrono for

medical or mental health reasons.  (UDF 26.)  Plaintiff remained on single cell status, despite not

having a current chrono.  (Dkt. No. 21 at 7.)

On December 3, 2008, plaintiff was temporarily transferred to CSP-Solano, and

provided a chrono for lower bunk/lower tier, but was not provided a single cell chrono.  (UDF

39.)  Plaintiff returned to HDSP on December 15, 2008, and remained single-celled.  (Id.; Dkt.

No. 21 at 7.)  On April 1, 2009, plaintiff was cleared for double celling.  (UDF 43.)  On April 7,

2009, Physician Assistant Medina did not issue a single cell chrono for plaintiff.  (UDF 44.)  On

November 5, 2009, plaintiff was again cleared for double cell housing.  (UDF 49.)  On January

27, 2010, plaintiff was provided a permanent medical chrono for lower bunk/lower tier housing,

but was not provided a single cell chrono.  (UDF 53.)  Plaintiff was single celled on May 3, 2010.

(UDF 55.)  It appears that plaintiff was then double celled with inmate Stevenson until June 29,

2010.  (UDF 61.)

In response to plaintiff's objection to being double celled, plaintiff was seen on

May 25, 2010, but the doctor did not order plaintiff a single cell chrono at that time.  (UDF 62.)

Plaintiff was seen by Dr. Ma on September 16, 2010, complaining of uncontrolled seizures.

(UDF 63.)  Plaintiff's medications were continued, a Dilantin level was ordered, but plaintiff was

not provided a single cell chrono.  (Id.)

On February 16, 2011, plaintiff was transferred to CCI-Tehachapi, and over his

objections, plaintiff was cleared for double cell housing.  (UDF 65.)

Plaintiff concedes that medical staff at HDSP never gave plaintiff a medical

chrono for single cell status.  (Dkt. No. 61 at 20.)  Because medical staff at HDSP did not find it

medically appropriate to issue plaintiff a medical chrono for single cell status, and plaintiff failed

to provide a medical expert's opinion that plaintiff's seizure disorder requires that plaintiff be

housed in a single cell, nonmedical staff, including defendants Perez, Cochrane, Williams and

Glover, cannot be deliberately indifferent to plaintiff's safety needs by clearing plaintiff for

1  double cell housing, failing to house plaintiff in a single cell, or placing plaintiff in a cell with a

2  cellmate.  In addition, because plaintiff did not have a current medical chrono for single cell

3  housing on April 1, 2009, defendants Perez, Cochrane, and Murray could not wrongfully take

4  plaintiff's single cell status from him.

5       Despite plaintiff's argument that every other prison provided plaintiff with a

6  single cell chrono, allegedly supporting his view that he was medically required to have a single

7  cell chrono, the undisputed facts do not support plaintiff's claim.  Rather, the record reflects that

8  plaintiff was initially provided a single cell chrono until his seizures were better controlled with

9  medication.  Although plaintiff was periodically and temporarily provided single cell chronos,

10  these chronos routinely expired, without renewal, and it appears plaintiff's single cell housing

11  was continued due to prison officials' failure to follow through rather than medical staff's belief

12  that it was medically required.  While a few doctors ordered a temporary single cell chrono for

13  plaintiff based on his reports of attacks on cellmates, many of the doctors did not, finding

14  plaintiff's claims atypical of seizures.  At least one psychiatrist noted his suspicion that plaintiff

15  was using his mental illness and seizure disorder for secondary gain, to obtain a single cell.

16  (UDF 26.)  Thus, the medical records provided do not reflect that medical staff consistently

17  found plaintiff's seizure disorder medically required him to be permanently single celled.

18       Plaintiff provided no medical opinion demonstrating that his epileptic condition

19  required him to be single celled during the periods at issue here, or presently.  Plaintiff's own

20  declaration, and that of inmates Watts and Stevenson, cannot rebut the declaration of Dr. Tate

21  because they are laypersons who are unqualified to offer medical opinions.  Without benefit of a

22  medical expert confirming plaintiff's seizure disorder requires that he be single-celled, plaintiff's

23  belief that his condition requires single cell housing constitutes a mere difference of opinion with

24  medical treatment, which does not rise to the level of an Eighth Amendment violation.

25  Moreover, plaintiff concedes that he does not report incidents of seizures or his alleged attacks

26  on cellmates following a seizure.  (Dkt. No. 61 at 16; UDF 18, 19.)  Defendants cannot be

1    deliberately indifferent to circumstances of which they are unaware.

2            In addition, plaintiff's medical records demonstrate that plaintiff's seizures were

3    controlled over time.  On February 29, 2008, plaintiff reported his seizures were controlled.

4    (UDF 32.)  In December of 2008, plaintiff reported he had no seizures for a year.  (UDF 39.)  On

5    March 14, 2009, plaintiff reported having no seizures for a month.  (UDF 42.)  On June 1, 2009,

6    plaintiff reported having no seizures since before he was prescribed Lamictal.  (UDF 47.)  On

7    September 3, 2009, plaintiff's sleepless EEG results were normal.  (UDF 48.)  On February 17,

8    2010, plaintiff reported that the Lamictal works with his seizures.  (UDF 54.)  Although plaintiff

9    now claims that his seizures are "never" controlled (dkt. no. 64 at 18), plaintiff failed to adduce

10   evidence to support such a claim.  Moreover, the undisputed facts demonstrate that when plaintiff

11   presents with medical complaints about his seizure control, medical staff appropriately addresses

12   those claims by ordering medical tests, and, if necessary, adjusting plaintiff's medication.

13           In his supplemental opposition, plaintiff claims medical defendants Swingle,

14   Nepomuceno, and Medina were deliberately indifferent to plaintiff's serious medical needs based

15   on their failure to issue a lower floor, lower bunk chrono, instead relying on security staff to

16   assign plaintiff's housing.  (Dkt. No. 71 at 2.)  Plaintiff argues that this puts him at risk for falling

17   from the tier or bunk during a seizure.  Plaintiff claims that he filed a grievance against defendant

18   Medina, who then took plaintiff's chrono for lower tier and floor that another doctor issued, in

19   retaliation for filing a grievance.  (Dkt. No. 71 at 3.)  Plaintiff supports his claim that defendants

20   were deliberately indifferent by pointing out that upon his transfer to CCI-Tehachapi, he was

21   provided a chrono on March 23, 2011, for a ground floor cell, a bottom bunk, and waist chains.

22   (Dkt. No. 71 at 23.)[22]  Plaintiff also relies on Snow v. McDaniel, 681 F.3d 978 (9th Cir. 2012),

23

24           [22]  Plaintiff also refers to Exhibit A-1 appended to his complaint for proof that the lower
     floor and lower bunk chronos for seizure patients is mandatory in all prisons.  (Dkt. No. 71 at 4,
25   citing Dkt. No. 61 at 35.)  However, the documents appended as Exhibit A-1 are plaintiff's prior
     chronos and medical records, and do not contain a prison policy or regulation requiring such a
26   chrono.  (Dkt. No. 61 at 35-50.)

                                                29

1   arguing that the medical defendants' failure to follow the recommendations of specialists and

2   renew his single cell chrono constitutes reckless endangerment and interference with previously-

3   prescribed medical treatment.

4          However, as defendants point out, plaintiff adduced no evidence demonstrating he

5   was housed on an upper tier or upper bunk while housed at HDSP, or that he fell while coming

6   down the stairs from an upper tier cell at HDSP.  The relevant grievance plaintiff provided

7   demonstrates that he was housed on a lower tier in August 2009 (Housing: D5-128), and that he

8   was informed that his lower bunk/lower tier needs would be evaluated by his primary care

9   physician.  (Dkt. No. 71 at 18-21.)[23]  On January 27, 2010, plaintiff was provided a permanent

10  chrono for lower tier/lower bunk housing.  (Dkt. No. 69-1 at 38.)  Plaintiff failed to rebut

11  defendants' evidence that at all times relevant herein, plaintiff was housed on a lower tier in a

12  lower bunk.

13         Moreover, plaintiff's reliance on <u>Snow</u> is unavailing.  Snow was diagnosed by

14  more than one orthopedic surgeon that Snow needed surgery to replace both of his hips, which

15  had degenerated so severely that he had excruciating pain and could barely walk.  <u>Id.</u>  Based on

16  the unchallenged medical records and inferences drawn in favor of Snow, the court found that a

17  reasonable jury could conclude that the decision of the non-treating, non-specialist physicians to

18  repeatedly deny the recommendations for surgery was medically unacceptable under all of the

19  circumstances.  <u>Id.</u>

20         Here, unlike in <u>Snow</u>, the neurologist and psychiatrist who saw plaintiff did not

21  recommend that plaintiff be permanently single-celled for the seizure disorder.  (Dkt. No. 69 at

22

23         [23]  Plaintiff provided a copy of his grievance HDP HC 11000002.  (Dkt. No. 71 at 8-13.)
    However, the gravamen of this grievance was plaintiff's "chronic, debilitating back and hip
24  problem."  (Dkt. No. 71 at 10.)  Plaintiff also provided copies of articles about epilepsy, and the
    behaviors of patients with temporal epilepsy, apparently obtained from the internet.  (Dkt. No. 71
25  at 27-37.)  However, even if these articles were admissible, none of the articles indicate that
    patients suffering from epilepsy or temporal epilepsy should be housed alone, or that such
26  patients are prone to attack persons who intervene.

25, 44-45.)  Although a few doctors issued a temporary single cell chrono, they also noted that

such housing was appropriate until plaintiff's seizures were controlled.  As noted above, the

medical records demonstrate that plaintiff's seizures were controlled.  None of the doctors

expressly stated that the diagnosis of temporal lobe epilepsy medically required an inmate to be

single cell housed.  Plaintiff did not provide such a medical opinion in opposition to the motion.

Because no medical or mental health professional or specialist recommended that plaintiff be

permanently housed on single cell status, defendants Swingle, Nepomuceno, and Medina did not

disregard recommendations by specialists or medical professionals that plaintiff be single celled.

Thus, plaintiff's reliance on Snow is unavailing.

Finally, plaintiff claims that he filed a grievance against defendant Medina, who

then took plaintiff's chrono for lower tier and floor that another doctor issued, allegedly in

retaliation for filing a grievance.  (Dkt. No. 71 at 3.)  However, defendants adduced evidence that

plaintiff's chrono for lower bunk and tier housing was revoked because plaintiff was seen

running around the track without his cane or mobility vest.  (UDF 37.)  Although plaintiff denies

he was running around the track, plaintiff adduced no further evidence demonstrating that

defendant Medina acted in retaliation, rather than based on the report of plaintiff's alleged

physical activity.

For all of the above reasons, defendants are entitled to summary judgment on

plaintiff's Eighth Amendment claims.

VI.  Equal Protection/Due Process

Plaintiff contends that defendant Bishop violated plaintiff's equal protection rights

and due process by finding plaintiff guilty in December 2009, of a disciplinary violation because

plaintiff obstructed an officer by refusing a cellmate in November 2009, after medical and mental

health staff found plaintiff did not require a single cell.  It appears that plaintiff seeks to have the

prison disciplinary set aside, and his lost time credits restored.

////

1          A.  Equal Protection

2          The "Equal Protection Clause of the Fourteenth Amendment commands that no

3   State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is

4   essentially a direction that all persons similarly situated should be treated alike."  City of

5   Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985).  State prison inmates retain a

6   right to equal protection of the laws guaranteed by the Fourteenth Amendment.  Walker v.

7   Gomez, 370 F.3d 969, 974 (9th Cir. 2004) (citing Lee v. Washington, 390 U.S. 333, 334 (1968)).

8              In the prison context, however, even fundamental rights such as the
           right to equal protection are judged by a standard of reasonableness
9           -- specifically, whether the actions of prison officials are
           "reasonably related to legitimate penological interests."  Turner v.
10          Safley, 482 U.S. 78, 89 (1987); see also Jordan v. Gardner, 986
           F.2d 1521, 1530 (9th Cir. 1993) (equal protection concerns fall
11          under Turner).

12  Walker, 370 F.3d at 974.

13         An equal protection claim may be established by showing that the defendant

14  intentionally discriminated against the plaintiff based on the plaintiff's membership in a protected

15  class, Serrano v. Francis, 345 F.3d 1071, 1082 (9th Cir. 2003), Lee v. City of Los Angeles, 250

16  F.3d 668, 686 (9th Cir. 2001), or that similarly situated individuals were intentionally treated

17  differently without a rational relationship to a legitimate state purpose, Village of Willowbrook v.

18  Olech, 528 U.S. 562, 564 (2000); Lazy Y Ranch Ltd. v. Behrens, 546 F.3d 580, 592 (9th Cir.

19  2008).

20         Here, plaintiff's equal protection claim fails because he did not demonstrate that

21  defendant Bishop intentionally discriminated against plaintiff based on plaintiff's membership in

22  a protected class, or that plaintiff is similarly situated to other inmates who were intentionally

23  treated differently.  Indeed, plaintiff's medical and mental health issues are unique to plaintiff.

24  Thus, there is no genuine issue as to any material facts regarding plaintiff's equal protection

25  claim.  Therefore, summary judgment on this claim should be granted.

26  ////

1          B.  Due Process

2          Plaintiff's due process claim is not cognizable under § 1983, pursuant to Heck v.

3  Humphrey, 512 U.S. 477 (1994), and Edwards v. Balisok, 520 U.S. 641 (1997).  A state

4  prisoner's § 1983 claim is not cognizable if success on the claim would necessarily imply the

5  invalidity of a still-valid sentence or disciplinary finding that affects the length of his

6  incarceration.  Heck, 512 U.S. at 486-87.  Consequently, a prisoner's § 1983 challenge to

7  disciplinary hearing procedures is barred if judgment in his favor would necessarily imply the

8  invalidity of the resulting loss of good-time credits.  Balisok, 520 U.S. at 646 (where state

9  prisoner alleged due process claims based on procedures used in disciplinary hearing that

10  resulted in a loss of good time credits, action was barred because a judgment in the prisoner's

11  favor would imply the invalidity of the disciplinary sanction).  Habeas corpus is the exclusive

12  remedy for a prisoner who is challenging the fact or duration of his confinement and seeking

13  immediate or speedier release.  Preiser v. Rodriguez, 411 U.S. 475, 488-90 (1973).

14          A decision in plaintiff's favor on his procedural due process claim would

15  necessarily imply the invalidity of his loss of good-time credits in connection with the December,

16  2009 rules violation report.  This consequence would directly and significantly affect his release

17  date.  Although plaintiff does not specifically request the restoration of good-time credits in the

18  relief portion of his amended complaint, the result is clearly implied from plaintiff's allegations

19  that because defendant Bishop did not adhere to the prescribed time constraints for holding a

20  hearing on the refusal to accept a cellmate charge, defendant Bishop was "barred from taking

21  good time credit."  (Dkt. No. 21 at 25.)  Such relief would invalidate the disciplinary charges and

22  the loss of good-time credits.  Therefore, plaintiff's due process challenge to the December, 2009

23  rules violation report is subject to dismissal, without prejudice, as barred under Heck and

24  Balisok.

25  ////

26  ////

1   VII.  Plaintiff's Motion for Sanctions

2           Throughout plaintiff's oppositions, plaintiff objects to defendants' use of

3   plaintiff's confidential medical and mental health records, and seeks sanctions for such use (dkt.

4   no. 62 at 2).

5           In Jaffee v. Redmond, 518 U.S. 1 (1996), the United States Supreme Court

6   formally recognized the psychotherapist-patient privilege.  Id.  The Court specifically held that

7   "confidential communications between a licensed psychotherapist and her patients in the course

8   of diagnosis or treatment are protected from compelled disclosure" Jaffee, 518 U.S. at 5.  The

9   Court also recognized, without elaboration, that like other testimonial privileges, this privilege

10  may be waived by the patient. Jaffee, 518 U.S. at 15 n.14.  A party waives this privilege when he

11  puts his mental health records at issue in litigation.  E.E.O.C. v. California Psychiatric

12  Transitions, 258 F.R.D. 391, 399 (E.D. Cal. 2009).

13          Here, plaintiff claims that he should be assigned to single cell housing due to

14  health care reasons because he has attacked cellmates during or shortly after experiencing

15  seizures.  However, plaintiff's medical records demonstrate that both medical and mental health

16  care providers addressed plaintiff's seizure disorder, as well as evaluated his need for single cell

17  status in connection with classification committee hearings.  For example, as described in the

18  undisputed facts above, in 1997, a psychiatrist attributed plaintiff's assaultive behavior to panic

19  attacks deriving from his mental illness rather than from epilepsy.  (UDF 7.)  In June of 2007, a

20  psychiatrist noted that plaintiff's reported symptoms of "going off" on cellmates was not typical

21  of seizures.  (UDF 26.)  In December of 2007, plaintiff was prescribed Lamictal, a medication

22  used to treat bipolar disorders and epileptic seizures.  (UDF 29.)

23          Because the undisputed facts demonstrate that plaintiff's medical and mental

24  health care records are relevant to claims placed at issue by plaintiff's litigation, plaintiff waived

25  the privilege by filing this action.  Moreover, plaintiff filed copies of a psychologist's notes in

26  support of his opposition.  (Dkt. No. 61 at 49-50.)  Plaintiff cannot rely on mental health records

34

1  yet deny defendants benefit of records relevant to plaintiff's claims.  Thus, plaintiff's motion for

2  sanctions is denied.

3  VIII.  Conclusion

4          Accordingly, IT IS HEREBY ORDERED that plaintiff's motion for sanctions is

5  denied (dkt. no. 62); and

6          IT IS RECOMMENDED that:

7          1.  The July 18, 2012 motion for summary judgment (dkt no. 57) be granted;

8          2.  Plaintiff's due process challenge to the December, 2009 rules violation report

9  be dismissed without prejudice; and

10         3.  Plaintiff's remaining claims be dismissed.

11         These findings and recommendations are submitted to the United States District

12  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

13  days after being served with these findings and recommendations, any party may file written

14  objections with the court and serve a copy on all parties.  Such a document should be captioned

15  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

16  objections shall be filed and served within fourteen days after service of the objections.  The

17  parties are advised that failure to file objections within the specified time may waive the right to

18  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

19  DATED:  December 17, 2012

20

21                                              Kendall J. Newman

22                                              KENDALL J. NEWMAN
                                                UNITED STATES MAGISTRATE JUDGE

23  chap1468.msj

24

25

26